**Bernfeld, DeMatteo & Bernfeld, LLP**
600 Third Avenue, 15th Floor
New York, New York 10016
(212) 661-1661
Fax (212) 557-9610
David Bernfeld, Esq.
Jeffrey Bernfeld, Esq.

*Attorneys for Defendants John Greenberger*
*Maccabee, Sherry Morse Maccabee,*
*John Greenberger Maccabee and*
*Sherry Morse Maccabee Living Trust,*
*John Greenberger Maccabee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,                                                        Adv. Pro. No. 08-01789 (BRL)

                Plaintiff-Applicant,                          SIPA LIQUIDATION

                v.                                            (Substantively Consolidated)

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                Defendant.

-----------------------------------------------------------------X
In re:

BERNARD L. MADOFF,

                Debtor.

-----------------------------------------------------------------X
IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,
                                                                   Adv. Proc. No. 10-05407
                Plaintiff,

                v.

JOHN GREENBERGER MACCABEE AND

SHERRY MORSE MACCABEE LIVING TRUST,
JOHN GREENBERGER MACCABEE,
individually and as Trustee of the John
Greenberger Maccabee and Sherry Morse
Maccabee Living Trust, SHERRY MORSE
MACCABEE, individually and as Trustee of the John
Greenberger Maccabee and Sherry Morse
Maccabee Living Trust

                Defendants.
-------------------------------------------------------------------X


# MEMORANDUM OF LAW IN SUPPORT OF
# <u>MOTION SEEKING A WITHDRAWAL OF REFERENCE</u>

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**PRELIMINARY STATEMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**BACKGROUND**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**POINT I**
**THE REFERENCE SHOULD**
**BE WITHDRAWN**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**POINT II**
**THE TRUSTEE'S INTERPRETATION OF SIPA**
**REQUIRES WITHDRAWAL OF THE REFERENCE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     **1. The Interest Payments on the Loan**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     **2. Withdrawals from Defendants' BLMIS Customer Accounts**. . . . . . . . . . . . . . . . 12

          **a.**      **Federal and State Securities Laws**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          **b.**      **The Trustee's Avoidance Powers**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**POINT III**
**THE TRUSTEE'S ALLEGATIONS RAISE**
**ISSUES UNDER SLUSA WHICH REQUIRE**
**SIGNIFICANT INTERPRETATION OF**
**NON-BANKRUPTCY FEDERAL LAW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Chemtura Corp. v. U.S.*, 2010 WL 1379752
  (S.D.N.Y. Mar. 26, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2nd Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . 7

*Eastern Airlines, Inc. v. Air Line Pilots Ass. (In re Ionosphere Clubs, Inc.)*,
  1990 WL 5203(S.D.N.Y. Jan. 24, 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Enron Power Mktg., Inc. v. Cal. Power Exch. Corp. (In re Enron Corp.)*,
  2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Dana Corp.*, 379 B.R. 449 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2nd Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Cablevision*, 315 B.R. 818, 821 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Sharp Int'l Corp*, 403 F.3d 43 (2nd Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Picard v. HSBC Bank, et. al.*, 11 civ. 763
  (S.D.N.Y. April 25, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 18, 19, 20

*Picard v. JP Morgan Chase & Co., et. al.*, 11 civ. 0913
  (S.D.N.Y. May 23, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Picard v. Katz, et. al.*, 11 civ 3605. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

**STATUTES AND RULES**

11 U.S.C § 546(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

11 U.S.C. § 548. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

11 U.S.C. § 544. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

15 U.S.C. § 78fff-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

15 U.S.C. §77p. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15 U.S.C. §78lll(4).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17 C.F.R. §240.10B-10 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 U.S.C.§157(d).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

59 Fed. Reg. 59,612, 59,613 59,614 (Nov. 17, 1994)
(to be codified at 17 C.F.R. pt. 240). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

N.Y.  Debt. & Cred. Law §272. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

NASD Rule 2340.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

NYSE Rule 409.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

NYUCC § 8-501.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

NYUCC § 8-503.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

NYUCC § 8-102.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rule 10b-10.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted in support of Defendants' motion to withdraw the reference to the Bankruptcy Court with respect to this adversary proceeding.

This case presents significant issues of non-bankruptcy federal law (including, *inter alia*, SIPA and other federal securities act statutes and regulations) which need to be resolved by this Court as opposed to the Bankruptcy Court. Accordingly, the requirements for mandatory withdrawal of the reference are clearly met and, for the reasons explained below, the motion should be granted.

## BACKGROUND

This adversary proceeding (the "Case") arises under the SIPC liquidation proceedings of Bernard L. Madoff Investment Securities ("BLMIS") now pending in the Bankruptcy Court.

In this Case, the Trustee seeks to avoid transfers not only in connection with the Defendants' BLMIS customer accounts but also with respect to interest payments on loans from Defendant John Maccabee's mother to Madoff going back to 1961. As set forth below, these loans were wholly separate from BLMIS, did not represent customer property and is, therefore, beyond the scope of the Trustee's mandate or his authority under SIPA. The Trustee has purposefully blurred the distinction between these two distinct categories of transactions in order to charge Defendants' accounts with these interest payments.

The Defendants in this case are a husband and wife and their joint living trust through which they held two Madoff accounts at the time that the Madoff fraud became public.[1] Each account had a separate account number and each filed for SIPC relief.

---

[1]     The Trustee's complaint acknowledges that there were actually two customer accounts held by the trust. Both had substantial account balances based on their final account statements.

Although the Trustee acknowledges that there were two separate accounts, he has issued a Determination Letter regarding the SIPC claim of only one of the accounts - not surprisingly the one that, under the Trustee's challenged cash in/cash out methodology, results in a negative net equity balance.  Significantly, the second account has a substantial positive net equity - even under the Trustee's cash in/cash out methodology - thus entitling it to receive a SIPC advance and to participate in the distribution of customer property as defined in SIPA.  Moreover, the equity balance of the second account sets off much of the claimed "other peoples money" that the Trustee purportedly seeks to recover.  For reasons not explained in the Complaint, the Trustee has still not issued a Determination Letter for this second account although more than 2½ years have elapsed since Madoff was arrested and the Complaint references only the first account. This approach seeks to deprive the Defendants of basic rights and remedies mandated by SIPA as well as important defenses in this proceeding, all to the considerable prejudice of these Defendants.  There is no basis in law, or fundamental fairness for making such an incomplete and distorted picture of the totality of the transactions around which the Trustee's claims revolve.

Compounding this distortion is the Trustee's attempt to inject in this Case involving the Defendants' BLMIS customer accounts, a separate 50-year old  loan transaction between Madoff individually and Mrs. Ruth Greenberger, Defendant John Maccabee's mother.  The Complaint alleges that, in 1961, Ruth Greenberger made three $100,000 bearer bonds owned by  her available as a subordinated capital loan to Madoff which carried an interest of 16½ %.[2]  The Complaint concedes that this bearer bonds loan transaction was bona fide and there is no dispute

_____

[2]     According to Defendant John Maccabee's deposition testimony, his mother's loans to Madoff were as follows: an initial loan of $10,000 in or about 1961; an additional $10,000 loan a year or two later; and the $300,000 bearer bonds loan in the early 1970's.

that the interest payments - first to Mrs. Greenberger and then, much later, to her children, including Defendant John Maccabee - were independent of Defendants' BLMIS customer accounts and were not, even in form, customer "profits" on BLMIS customer transactions.

Despite the conceded validity of the loan - and that it actually happened - the Trustee then makes the unsupported leap to charge that this very same loan transaction somehow put these Defendants on notice of Madoff's future fraud, decades later. Thus, the Trustee has alleged that based on these loans, these Defendants either knew and should have known of the Madoff fraud. However, his "proof" of this is simply that the interest payments to the mother were apparently paid in cash and, in the Trustee's view, the interest rate was too high.[3]

However, the loan arrangement began in 1961 when Madoff was in his early twenties and just starting out in business and Defendant John Maccabee was only a teenager. Significantly, not even the Trustee alleges that Madoff was engaged in a ponzi scheme at that time or even when the loan was later increased. Indeed, Madoff acknowledges that his Ponzi scheme did not even start until sometime in the early to mid 1990's and that it took some time thereafter to "blossom" fully. How interest payments made by Madoff to Mrs. Greenberger in cash under an arrangement beginning decades before could have put these Defendants on notice that Madoff would <u>subsequently</u> operate his ponzi scheme is left unexplained by the Complaint. Simply put, the loans made by Mrs. Greenberger in the 1960's and or 1970's were in no way indicative of a future fraud nor was the fact that the arrangement continued for many years - both with Mrs.

---

[3] Remarkably, the Trustee also asserts that the interest rate of 16½% was, itself, clear notice to these defendants of Madoff's future fraud. Beyond the logical gap between a 1970 loan as notice of a Ponzi scheme that didn't start until decades later, the Trustee's claim ignores the reality that when the transaction took place in the 1970's, interest rates were dramatically higher than current rates and the fact that the loan was made for risk capital.

Greenberger and, later, with her children - sufficient to put anyone on notice of any fraud.

This loan arrangement was with Madoff and had nothing whatsoever to do with BLMIS customers, their accounts or any ponzi scheme. The loan was a real transaction and the interest payments were anything but "fictitious." The Trustee concedes that the payments did not come from any customer account maintained by Madoff.[4] For all intents and purposes, the bonds were treated by Madoff as his own; indeed, Defendant John Maccabee testified in his deposition that an FBI agent told him the bonds ultimately ended up in Madoff's wife's possession.

Thus, despite the Trustee's claim that the loan arrangement between Madoff and Mrs. Greenberger should have put her son (as well as his future wife who he would not even meet until at least 15 years later) on notice of Madoff's future fraud, that claim cannot withstand analysis. Equally unconvincing is the Trustee's attempt to impose a retroactive duty to inquire upon the Defendants based on little more than an allegation of friendship between Madoff and one of Defendant John Maccabee's siblings[5] and the manner in which the interest payments were made.

The Defendants strongly dispute that they had any wrongful knowledge or, therefore, any duty to make inquiry regarding the mother's loan or the interest payments thereon, particularly since, as stated, there can be no dispute regarding the bona fides of the loans.

The Defendants also flatly deny that they had any knowledge of Madoff's fraud or a duty

---

[4]     Other than for a brief period towards the end of Ruth Greenberger's life, the bonds (and their replacements) were not even placed or held in any BLMIS account.

[5]     At his deposition, Defendant J. Maccabee testified that neither he nor his wife (defendant Sherry Morse Maccabee) had a "friendship" with Madoff. Indeed, even as the Trustee alleges in the Complaint, any friendship relationship was with John's older sister, her husband and the Madoffs, dating back to their high school days together.

to inquire when they made withdrawals from their Trust's BLMIS customer accounts, particularly given the facially valid account statements and transaction confirmations they received. Under applicable securities law, they had every right to rely on those statements as reflective of what they owned and what the broker owed them. The Trustee's attempt retroactively to dismiss those account statements and trade confirmation as if they had never issued, is contrary to well- settled and clear securities law. Those laws literally make customer Account Statements conclusive and contemplate that customers will rely on what they reflect in their day to day financial decision making.

The Trustee's apparent contention that duties of inquiry may be imposed retroactively simply because a broker has later been convicted of a ponzi scheme and a liquidation of the brokerage was commenced under SIPA years later, defies both logic and law, as well as fundamental fairness. It flies in the face of various non-bankruptcy federal statutes, including SIPA itself. Simply stated, the Trustee's avoidance claims in this action are in conflict with applicable state and federal securities laws upon which the Defendants had every right to rely.

As with other avoidance actions that the Trustee has brought, he has applied a "cash in/cash out" analysis over the lifetime of the Defendants' customer accounts in an attempt to increase dramatically the dollar amount of the avoidance claims against them and, in the process, reach past all applicable statute of limitations, thereby reversing reported, closed transactions which had taken place over the course of decades. In addition, the Trustee violates SIPA and other applicable federal securities laws by his baseless attempt to treat the interest payments on the unrelated loans by Mrs. Greenberger as if they were, instead, withdrawals from Defendants' customer accounts. The motive for this attempt is clear: to artificially decrease the Defendants'

SIPA "net equity" and thereby artificially increase the size of the avoidance claims against them. Equally clear is the fact that applicable law prohibits the Trustee from doing this.

Beyond all of the foregoing, the interest payments on the loan as well as the withdrawals made from the Defendants' BLMIS customer accounts, were all made in connection with, and in satisfaction of, antecedent debts and are, thus, beyond the avoidance powers of the Trustee under SIPA or the Bankruptcy Code. Indeed, the Trustee's claim that SIPA actually confers such authority on him is in direct conflict with federal securities laws, the Bankruptcy Code and the very language and purpose of SIPA .

Accordingly, the Trustee's avoidance claims raise significant issues under SIPA regarding the nature and extent of his authority and the nature and extent of any duty to inquire on the part of the Defendants under the securities laws or otherwise. The transfers that the Trustee seeks to avoid would not be avoidable under the Bankruptcy Code nor does the language of SIPA provide the avoidance powers the Trustee asserts. Clearly, the Trustee's strained  interpretation of SIPA on this score, will require significant interpretation of SIPA and related securities statutes, thus mandating the requested withdrawal of reference.[6]

As set forth below, the Trustee's avoidance claims also raise other issues of non-bankruptcy law, including federal and state securities laws and SLUSA, each of which will require significant interpretation by this Court of these non-bankruptcy laws. It is therefore for this Court to decide such issues rather than the Bankruptcy Court.

---

[6]    This Court has already granted two applications for withdrawal of reference in connection to the BLMIS liquidation based on an explicit ruling that: (i) SIPA is a Securities Act statute, not a Bankruptcy Code enactment; and (ii) that significant issues under SIPA necessarily require withdrawal of the reference.

As a result, this motion should be granted and the reference to the Bankruptcy Court

should be withdrawn.

## ARGUMENT

## POINT I

## THE REFERENCE SHOULD BE WITHDRAWN

Federal District Courts have original jurisdiction over all bankruptcy cases and other civil

proceedings arising under, in or relating to cases under Title 11. Although such cases are

automatically referred to the Bankruptcy Court in the Southern District, the District Court can

withdraw the reference of such a case either on its own motion and or on the motion of a party

pursuant to 28 U.S.C.§157(d).

In relevant part, 28 U.S.C. §157(d) provides as follows:

> The district court may withdraw, in whole or in part, any case or
> proceeding referred under this section, on its own motion or on
> timely motion of any party, for cause shown. The district court
> shall, on timely motion of a party, so withdraw a proceeding if the
> court determines that resolution of the proceeding requires
> consideration of both title 11 and other laws of the United States
> regulating organizations or activities affecting interstate commerce.

28 U .S.C. § 157( d).

Thus, withdrawal is mandatory "... where substantial and material consideration of non-

Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *In re*

*Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2nd Cir. 1990). Consideration has been held to be

"substantial and material" where the case requires a "significant interpretation, as opposed to

simple application, of federal laws apart from the bankruptcy statutes." *City of New York v.*

*Exxon Corp.*, 932 F.2d 1020, 1026 (2nd Cir. 1991); *see also*, *In re Dana Corp.*, 379 B.R. 449, 453

(S.D.N.Y. 2007).  This provision was intended to "assure that an Article III judge decides issues calling for more than routine application of [federal laws] outside the Bankruptcy Code." *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp. (In re Enron Corp.)*, 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004) (*quoting*, *Eastern Airlines, Inc. v. Air Line Pilots Ass. (In re Ionosphere Clubs, Inc.)*, 1990 WL 5203, at *5 (S.D.N.Y. Jan. 24, 1990)).  The need for mandatory withdrawal is highlighted where a matter of first impression is presented.  *See*, *Chemtura Corp. v. U.S.*, 2010 WL 1379752, at *1 (S.D.N.Y. Mar. 26, 2010) ("Where matters of first impression are concerned, the burden of establishing a right to mandatory withdrawal is more easily met.").

As set forth below, this Case involves issues that will require significant interpretation of non-bankruptcy statutes, including issues of first impression.[7]  Indeed, those issues predominate and will likely be dispositive of the claims.  Accordingly, the reference to the Bankruptcy Court must be withdrawn and this Case should be heard and determined in this Court.

## POINT II

### THE TRUSTEE'S INTERPRETATION OF SIPA REQUIRES WITHDRAWAL OF THE REFERENCE

The Trustee seeks to avoid transfers related both to the Defendants' withdrawals from

---

[7]     There have already been two written decisions in this Court withdrawing reference in adversary proceedings brought in the Bankruptcy Court arising from the Madoff Liquidation.  In *Picard v. HSBC Bank, et. al.*, 11 civ. 763 ("*HSBC*") and *Picard v. JP Morgan Chase & Co., et. al.*, 11 Civ. 0913 ("*JP Morgan*") the Court ruled that the substantial interpretation of statutes that are also required to be interpreted in the instant Cases mandated withdrawal of the reference.  These decisions are annexed to the Bernfeld Declaration as Exhibits B and C for the Court's convenience.  Further, at oral argument in *Picard . Katz, et. al.*, 11 civ 3605, this Court has indicated that the reference should be withdrawn with respect to a number of issues that also appear in this Case.

their customer accounts and with payments of interest on the mother's 1961 loan to Madoff. IN each of these categories of transfers, the Trustee's interpretation is at odds with other applicable law and is not supported by SIPA's plain language. At a minimum, the Trustee's assertions raise issues that will require significant interpretation of SIPA which is for this Court rather than the Bankruptcy Court.

This Court has already ruled that SIPA is a Securities Act statute and not a Bankruptcy statute:

> SIPA expressly provides that it shall be considered an amendment to, and section of, the Securities Exchange Act of 1934, and for this reason is codified in Title 15 (where securities laws are placed), rather than in Title 11 (where bankruptcy laws are placed). See 15 U.S.C. §78bbb ('Except as otherwise provided in this chapter, the provisions of the Securities Exchange Act of 1934 .. , apply as if this chapter constituted an amendment to, and was included as a section of, such Act.'). The reason for this language and placement is that SIPA is, first and foremost, concerned with the protection of securities investors (as its very title states), whether in or outside the bankruptcy context

*HSBC*, Bernfeld Declaration, Ex. B, p. 6. As such, it is fair to state that whenever a significant SIPA issue is presented for resolution in a case before the Bankruptcy Court, a withdrawal of reference is invariably mandated. As this Court explained:

> A substantial issue under SIPA is therefore, almost by definition, an issue 'the resolution of [which] requires consideration of both Title 11 and other laws of the United States.'

*HSBC*, Bernfeld Declaration, Ex. B, p. 6-7 (*quoting*, 28 U.S.C. § 157(d)). *See also*, *JP Morgan* ("Thus, an issue that requires significant interpretation of SIPA undoubtedly requires consideration of law outside Title 11"). The application of SIPA to avoidance actions in this context presents matters of first impression requiring "significant interpretation" of SIPA

throughout every stage of these matters.[8]

Since, as discussed below, there are issues raised herein requiring significant interpretation of SIPA, withdrawal of the reference is mandated.

**1. The Interest Payments on the Loans.**

Throughout the Complaint, the Trustee basically admits that the so-called "off-the-books cash payments" represent interest on the subordinated capital loan made by Defendant John Maccabee's mother - long before even the Trustee alleges any ponzi scheme began. With the exception of a short period of time, these bonds were not even maintained or recorded in a BLMIS account and, according to the FBI ended up in Madoff's wife's possession. The payment of interest for the use of this subordinated capital began long before the existence of BLMIS or any predecessor to the IA business that the Trustee is empowered to liquidate.[9] These payments were not made as "fictitious profits" from the ponzi scheme but, rather, were interest payments by Madoff for his use of the subordinated capital which had undisputedly been provided to him. Neither the Trustee's "accusation" of a close personal relationship between Defendants' family and Madoff nor the manner in which the Defendants' received the interest payments changes

---

[8]     Indeed, since the Bankruptcy Code only applies to these actions to the extent not inconsistent with SIPA, at every stage, the interplay between the Bankruptcy Code and SIPA, will require a "significant interpretation" of SIPA to ensure that the particular code provision - and the Trustee's asserted view of it - do not conflict with the language and purpose of SIPA. This is particularly so here given the Trustee's broad and unprecedented expanded interpretation of his powers under both SIPA and the Bankruptcy Code.

[9]     While the Trustee refers to BLMIS receiving these bonds in 1961, BLMIS was not formed until 2000 and the IA business and ponzi scheme that are the subject of the SIPC liquidation did not begin until the 1980's at the earliest and, in all likelihood, not until the 1990's.

these basic facts.[10]

The Trustee's authority is limited to the recovery of "customer property" as defined under SIPA. Customer property, as defined in SIPA, is limited to property held by a registered broker-dealer in connection with a customer's brokerage account. *See*, 15 U.S.C. §78lll(4). The definition does not embrace an unrelated loan transaction or the interest payments made thereon. As such, the Trustee is not authorized to extend his avoidance powers to the interest payments. In any event, to the extent that the Trustee might claim that these interest payments somehow represent customer property, this presents an issue requiring significant interpretation of SIPA.

Moreover, even if the interest payments were transfers that could, *arguendo*, come under the umbrella of the BLMIS SIPC liquidation, the Trustee's assertion is that the Defendants had no right to rely on the validity of a straight forward loan arrangement going back decades with John Maccabee's mother. The Trustee appears to be asserting that, the fact that Madoff ultimately engaged in a ponzi scheme which resulted in a SIPC liquidation, renders an otherwise valid transaction to be part and parcel of that subsequent fraud and otherwise legitimate interest payments to be avoidable fraudulent transactions. As noted, based on little more than "guilt by association" and the manner in which the interest payments were made, the Trustee asserts that SIPA empowers him to impose a retroactive duty on Defendants to inquire into the nature of Madoff's overall business or risk the forfeiture of interest payments on an otherwise undisputedly legitimate loan. The allegation that Defendants' family had a close relationship to Madoff, even if true, would not create such a duty. Nor, for that matter, does the manner in which the

---

[10]     Nor, for that matter, does the trustee's use of pejorative language (such as "riding the gravy train") and unsupported accusations of "awareness" of the ponzi scheme convert these payments into anything other than payments of interest on a decades-old loan.

Defendants received their interest payments.   There is nothing in the plain language of SIPA which imposes any such duty either.

The Trustee's assertion that he can impose an additional, retroactive duty of inquiry on Defendants regarding a loan arrangement going back almost 50 years and which began with a previous generation simply because the borrower later engaged in a ponzi scheme which resulted in a SIPC liquidation raises a significant issue requiring interpretation of SIPA.[11]

In addition, these interest payments discharged antecedent debt from Madoff to the Defendants who were creditors.  As discussed below, transfers to creditors which discharge antecedent debt are not avoidable and do not constitute fraudulent transfers.  The Trustee's strained interpretation of SIPA is at odds with this otherwise well-settled law and raises significant issues requiring interpretation of SIPA by this Court.

As a result, the reference should be withdrawn.

**2.  Withdrawals from Defendants' BLMIS Customer Accounts**

The Trustee also seeks to avoid transfers relating to withdrawals made from Defendants' BLMIS customer accounts.  But these withdrawals, as well as all previous withdrawals upon which he has based his net "cash in/cash out" calculations,[12] were made in reliance upon account

---

[11]     During oral argument on a similar motion in *Picard v. Katz*, this Court has already indicated that such an interpretation of SIPA requires withdrawal of the reference.

[12]     By disregarding all account statement credits to the account other than deposits and treating all withdrawals over the life of the account as withdrawals of principal, the Trustee has effectively written the applicable statutes of limitation out of the federal and state claims he has asserted.  The use of a "cash in/cash out" formulation over the life of an account and related accounts (in many cases over the course of decades and multiple generations of investors) would allow the Trustee to reach back and effectively reverse transactions far beyond any applicable statute of limitations.  Whether, and why the Trustee believes, SIPA allows him to do so presents yet another substantial issue under SIPA that requires withdrawal of reference to this Court.

statements and trade confirmations that: (a) the Defendants received and had the right to rely upon as a matter of law; and (b) created obligations owed by BLMIS to the Defendants which were then discharged, at least in part, by the withdrawals that are the subject of the Cases. The Trustee's stated interpretation of SIPA and his claimed authority to bring the instant avoidance actions flies in the face of established federal and state securities law and goes well beyond the avoidance powers granted to him under SIPA and the Bankruptcy Code.

### a. Federal and State Securities Laws.

The Trustee's contends that SIPA allows him to treat as nullities all account statements and trade confirmations received by Defendants over the entire course of the customer's account with Madoff. The Trustee thus puts squarely at issue whether a customer may <u>ever</u> rely on <u>any</u> account statements or trade confirmations received from his broker and whether a SIPC trustee can, decades later, come in and simply disavow those statements as the Trustee now proposes. Such a proposition, if put into effect, would paralyze the securities industry and infuse it with never-ending uncertainty.

Further, the Trustee again would retroactively impose a duty of inquiry on Defendants and other securities customers that the Trustee asserts only comes into existence upon the commencement of a liquidation under SIPA. In other words, it is the Trustee's position that the securities laws that allow a customer to rely upon account statements and transaction confirmations are retroactively nullified in the event a broker commits fraud and a SIPC liquidation subsequently occurs. Here, the Trustee essentially argues that because the Defendants' family and Madoff knew each other, that creates an additional duty of inquiry which

wipes out securities laws which otherwise apply.[13]  The Defendants strongly dispute this contention.

Under applicable securities laws and regulations, customer account statements and trade confirmations are actually required to be honored as issued and expressly create obligations from the broker to the customer regardless of whether or not the securities referred to in the documents had actually been purchased by the broker.  Those laws explicitly confirm that a customer may rely on the broker's account statements both to reflect what the customer owns and to show what the broker owes the Customer.

Prior to the enactment of SIPA, stock ownership was generally evidenced by a physical certificate registered in the name of the customer and maintained in the physical custody of the customer.  SIPA was enacted, in large part, to address the unwieldy and overwhelming backlog of paperwork that this required.  The enactment of SIPA allowed the industry to hold a customer's securities in street name without registering and issuing physical certificates in the customer's name.

As a consequence of that dramatic shift, it was necessary to provide the customer with protections that were serve as the functional equivalent of, or substitution for, the physical certificate.  The account statement and trade confirmation serve that precise function.

Regardless of any personal relationship alleged by the Trustee, these Defendants were customers of a registered broker-dealer subject to SEC regulations and other federal and state securities laws.  As such, BLMIS was required to provide account statements and trade

---

[13]      Contrary to the Trustee's argument, a personal relationship with a broker would tend to lower one's suspicions rather than create a heightened duty to inquire.

confirmations to its customers. *See*, Rule 10b-10, 17 C.F.R. §240.10B-10 (2010); Confirmation

of Transactions, 59 Fed. Reg. 59,612, 59,613 (Nov. 17, 1994) (to be codified at 17 C.F.R. pt.

240) ("For over 50 years, the customer confirmation has served basic investor protection

functions by conveying information allowing investors to verify the terms of their transactions;

alerting investors to potential conflicts of interest with their broker-dealers; acting as a safeguard

against fraud; and providing investors the means to evaluate the costs of their transactions and

the quality of their broker-dealer's execution.").

FINRA and NYSE rules similarly require the issuance of periodic account statements. *See*

NASD Rule 2340 (Customer Account Statements); NYSE Rule 409 (Statements of Accounts to

Customers). These statements are deemed so vital to the process that customers who have given

their broker trading authority may not waive the right to receive such statements. *See*

Confirmation of Transactions, 59 Fed. Reg. 59,612, 59,614 ("The customer may not waive this

periodic report.").

The property rights enforced by these federal securities laws and regulations are created

under state law. Under Article 8 of the New York Uniform Commercial Code, once an account

statement is issued, the broker has incurred an obligation to the customer as reflected therein.

*See*, NYUCC § 8-501(b) ("a person acquires a security entitlement[14] if a securities

intermediary[15]... (1) indicates by book entry that a financial asset has been credited to the

---

[14]    A "security entitlement" is defined as "the rights and property interest of an entitlement holder with respect to a financial asset [including a security, *see* NYUCC § 8-102(a)(9)(I)] specified in Part 5 [of Article 8]." NYUCC § 8-102(a)(17). It is "a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary." NYUCC § 8-503 cmt. 2.

[15]    A "securities intermediary" includes a broker. *See* NYUCC § 8-102(a)(14)(ii).

15

person's securities account . . . [or] (3) becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account."); NYUCC §8-501 cmt. 2 (It is "a basic operating assumption of the indirect holding system that once a [broker] has acknowledged that it is carrying a position in a financial asset for its customer . . . the [broker] is obligated to treat the customer . . . as entitled to the financial asset.").

Once this obligation is created through the issuance of the statement, the broker owes the securities to the customer whether or not the securities were actually purchased. *See*, NYUCC § 8-501(c) ("a person has a security entitlement even though the securities intermediary does not itself hold the financial asset"); NYUCC § 8-501 cmt. 3 ("The entitlement holder's rights against the securities intermediary do not depend on whether or when the securities intermediary acquired its interests.").[16]

Thus, under applicable federal and state securities laws, BLMIS owed the Defendants and other Madoff customers the securities and amounts set forth in their account statements. According to their account statements and trade confirmations, at the time of each withdrawal, the customer had an account balance at least equal to or in excess of the amount withdrawn. BLMIS owed them the balances reflected in those account statements.

### b.  The Trustee's Avoidance Powers.

As a result of the foregoing, it cannot seriously be disputed that the withdrawals from the Defendants' customer accounts which the Trustee seeks to avoid are the subject of the discharged

---

[16]    The Trustee's assertion that BLMIS customers such as the Defendants did not have the right to rely on their account statements and trade confirmations is in direct contradiction to these provisions of federal and state securities law.  The resolution of these issues will require substantial interpretation of non-bankruptcy federal law and, therefore, mandates withdrawal of the reference.

BLMIS's pre-existing debt to the customers under applicable federal and state securities laws and that, as set forth in their statements, these Defendants were and are creditors of BLMIS.[17]  As such, the instant avoidance actions are prohibited.  Indeed, those withdrawals cannot be treated as fraudulent conveyances nor form the basis for an avoidance action.

In that regard, it is essential to note that a SIPC trustee's avoidance powers are strictly limited to those provided for under the Bankruptcy Code.  15 U.S.C. § 78fff-2(c)(3) (The Trustee may avoid a transfer but only "if and to the extent that [a] transfer is voidable or void under the provisions of title 11.").  The Bankruptcy Code does not allow avoidance of transfers made to creditors.  *See*, 11 U.S.C. §§ 544, 548.  Further, since the account statements reflected that each withdrawal was a repayment of an existing debt, the withdrawal, as a matter of law was *not* a fraudulent conveyance and the Trustee's complaint is defective as a matter of law.  *See*, *e.g.*, *In re Sharp Int'l Corp*, 403 F.3d 43, 54 (2nd Cir. 2005) *(* " [A] conveyance which satisfies a antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another."); *see also*, N.Y.  Debt. & Cred. Law §272 (a transfer which satisfies an antecedent debt is not a fraudulent conveyance since, by statute, the satisfaction of an antecedent debt  is deemed "fair consideration" and  a "fair equivalent" therefor).

* * *

The very conflict between the Trustee's stated interpretation of SIPA and securities laws as well as the Bankruptcy Code requires withdrawal of the reference.  Putting aside the Trustee's

---

[17]     As noted above, the interest payments also were in satisfaction of antecedent debt relating to the 1961 loan arrangement.  It should also be noted that the Trustee affords no credits for the $300,00 principal of that loan which remains unpaid.

novel interpretation of SIPA , these conflicts independently require the withdrawal of the reference.  *See*, *HSBC*, Bernfeld Declaration, Ex. B, p. 12 (deeming a conflict between SIPA and bankruptcy law as "something that itself warrants withdrawal of the bankruptcy reference"); *see also*, *In re Cablevision*, 315 B.R. at 821 ("The very existence of a dispute as to whether the rights of [investors] under the [Trust Indenture Act] and Williams Act supersede Section 304 [of the Bankruptcy Code] or whether the Bankruptcy Code overrides the TIA, regardless of the ultimate resolution of such dispute, mandates withdrawal."); *Gredd*, 2001 WL 840187, at *2-4 (withdrawing reference where federal securities laws "arguably conflict[ed]" with the Bankruptcy Code).[18]

As a result of the foregoing, the reference must be withdrawn.

### POINT III

### THE TRUSTEE'S ALLEGATIONS RAISE ISSUES UNDER SLUSA WHICH REQUIRE SIGNIFICANT INTERPRETATION OF NON-BANKRUPTCY FEDERAL LAW.

Unlike the typical avoidance action (whether in the context of a bankruptcy or SIPA liquidation) which simply seeks to avoid individual transfers where the debtor was insolvent at the time and no value was provided in exchange, here, the Trustee's claims are based upon the assertion that all monies received as a result of any withdrawal represents "other people's money."  *See*, Complaint, ¶4.

In that regard, the Complaint alleges that the Trustee brings this Case not on behalf of BLMIS, but rather on behalf of "those defrauded customers of BLMIS who invested more money

---

[18]    The Trustee's claims also are in conflict with §546(e) of the Bankruptcy Code which shields securities transactions from avoidance claims.

in BLMIS than they withdrew"). By making that claim, the Trustee has triggered the need to make an analysis to determine whether these clearly representative claims are "covered class actions" under the Securities Litigation Uniform Standards Act ("SLUSA").

Under SLUSA, a "covered class action" is preempted and required to be dismissed if it, *inter alia*, (a) is based upon state law; and (b) alleges "an untrue statement or omission of material fact in connection with the purchase and sale of a covered security." *See*, 15 U.S.C. §77p; *HSBC*, Bernfeld Declaration, Ex. B, pp. 12-13. A "covered class action" is one in which (1) "damages are sought on behalf of more than 50 or more persons or prospective class members" or (2) "one or more named parties seeks to recover damages on a representative basis on behalf of themselves and other unnamed parties." *See*, 15 U.S.C. §77p(f)(2)(A); *HSBC*, Bernfeld Declaration, Ex. B, p. 13.

Here, the Complaint states that it has been brought on behalf of thousands of customers and alleges untrue statements and omissions of material fact in connection with the purchase and sale of covered securities. Each of the actions contains claims under the New York Debtor and Creditor law to recover purportedly fraudulent transfers made to the Defendants as part and parcel of Madoff's fraudulent ponzi scheme.

As a result, it would appear on its face that these claims under the New York Debtor and Creditor Law fall within the preemption provisions of SLUSA and must be dismissed. At a minimum, this Court will be required to interpret SLUSA as it applies to such actions - another matter of first impression raised by these actions - and yet another reason why withdrawal of

reference is mandated.[19]

## **CONCLUSION**

For all of the reasons contained herein, the reference to the Bankruptcy Court should be

withdrawn.

Dated: New York, New York
      July 15, 2011

                    Bernfeld, DeMatteo & Bernfeld, LLP


                    By:_____
                        David B. Bernfeld (dbb-0177)
                        Jeffrey L. Bernfeld (jlb-1615)

                    *Attorneys for Defendants John Greenberger*
                     *Maccabee, Sherry Morse Maccabee,*
                     *John Greenberger Maccabee and*
                     *Sherry Morse Maccabee Living Trust,*
                     *John Greenberger Maccabee*

                    600 Third Avenue, 15th Floor
                    New York, New York 10016
                    (212) 661-1661

---

[19]     This Court has already ruled that interpretation of SLUSA in another Madoff case requires withdrawal of the reference. *See*, *HSBC*, Bernfeld Declaration, Ex. B, p. 13-14.